## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

JULIE MAE DAY,          :
:
        Plaintiff     :    No. 3:14-CV-2299
:
vs.          :    (Judge Nealon)
:
CAROLYN W. COLVIN, Acting  :
Commissioner of Social Security,  :
:
        Defendant    :

**FILED**
**SCRANTON**
JAN 1 1 2016
PER _____
DEPUTY CLERK

## MEMORANDUM

On December 3, 2014, Plaintiff, Julie Mae Day, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. § 1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her applications for DIB and SSI on March 21, 2012, alleging disability beginning on January 19, 2012 due to severe brain trauma and a serious concussion. (Tr. 150, 164).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on March 19, 2010.  (Tr. 2-11).  On May 30, 2012, Plaintiff filed a written request for a hearing before an administrative law judge.  (Tr. 92).  An initial hearing was held on April 11, 2013, before administrative law judge Michelle Wolfe ("ALJ"), at which Plaintiff and an impartial vocational expert Ms. Kane ("VE") testified.  (Tr. 42).  On May 29, 2013, the ALJ denied Plaintiff's claim.  (Tr. 42).  On July 31, 2013, Plaintiff filed a request for review with the Appeals Council.  (Tr. 11).  On October 30, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).  Thus, the ALJ's decision stood as the final decision

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on February 25, 2015.  (Doc. 7).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

of the Commissioner.

Plaintiff filed the instant complaint on December 3, 2014. (Doc. 1). On February 25, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 6 and 7). Plaintiff filed a brief in support of his complaint on April 10, 2015. (Doc. 8). Defendant filed a brief in opposition on May 12, 2015. (Doc. 9). Plaintiff filed a reply brief on May 26, 2015. (Doc. 10).

Plaintiff was born in the United States on July 1, 1961, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 7, 46). Plaintiff completed one (1) year of high school, and can communicate in English. (Tr. 164). Her employment records indicate that she previously worked as a baker, convenience store cashier, and a factory laborer. (Tr. 165). The records of the SSA reveal that Plaintiff had earnings in the years 1978 through 1980, 1987 through 1993, and 1998 through 2010. (129). Her annual earnings range from a low of no earnings from 1981 through 1986 and 1994 through 1997 to a high of nineteen thousand five hundred thirty-nine dollars and eighteen cents ($19,539.18)

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.  See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

in 2006. (Tr. 129). Her total earnings during those thirty-two (32) years were two hundred forty-two thousand eight hundred seventy-two dollars and thirty-two cents ($242,872.32). (Tr. 129).

In a document entitled "Function Report - Adult" filed with the SSA on April 22, 2012, Plaintiff indicated that she lived in a house with her family. (Tr. 181). When asked how her injuries, illness or conditions limited her ability to work, Plaintiff stated:

> I am unable to move in any way without being dizzy or lightheaded. I experience blackouts. I cannot read, text, use a computer. I cannot drive. I cannot be around lights, sounds, people or anything that may stimulate my brain. I am to stay in my home and rest in quiet. I cannot speak very long without forgetting words or how to say them.

(Tr. 182). From the time she woke up until the time she went to bed, Plaintiff stayed home with the lights off, rested, slept, listened to the television, and "[thought] a lot." (Tr. 182). Plaintiff took care of her thirteen (13) year old grandson, making sure he was up for school at 6:30 a.m. (Tr. 182). She took care of her dog, making sure he would go to the bathroom if no one else was home to do so. (Tr. 182). Her adult children would help her take care of her grandson and dog. (Tr. 182).

Before her illnesses, injuries, or conditions began, Plaintiff was able to

4

stand for more than a few minutes, read, use a computer, watch television, drive, be around people, lights, and sounds, move around without being dizzy and lightheaded, speak clearly, and see without blurry vision. (Tr. 182). In terms of personal care, Plaintiff stayed in her pajamas "most of the time" and got very dizzy and blacked out during showers, but had no problems otherwise. (Tr. 182). She was able to prepare her own easy meals such as pizza, burgers, frozen meals, and cereal twice a day, and the time it took her to prepare her meals depended on how dizzy she was at that moment. (Tr. 183). She did not do any house or yard work because she was too dizzy to move around very much. (Tr. 183). She was able to shop for groceries once a month, which took her two (2) hours and required accompaniment by another person. (Tr. 184). She was able to walk "sometimes 10 feet [before needing to rest] and then [would be] too dizzy to continue." (Tr. 186). When asked to check what activities her illnesses, injuries, or conditions affected, Plaintiff did not check sitting, kneeling, hearing, completing tasks, understanding, following instructions, using hands, or getting along with others. (Tr. 186).

Regarding her concentration and memory, Plaintiff did not need special reminders to take care of her personal needs or go places. (Tr. 185). She could count pay bills, but could not count change, handle a savings account, or use a

5

checkbook due to short-term memory problems as a result of her illnesses, injuries, or conditions. (Tr. 184). She was not supposed to focus on anything so could not pay attention, had difficulty finishing what she started because she would have to stop to remember how to say a word, could follow written instructions "okay," but did not read unless she had to, and did not receive spoken instructions from anyone. (Tr. 186). She handled stress and changes in routine well. (Tr. 187).

Socially, Plaintiff went outside three (3) times a week accompanied by another person, and could not drive, but could ride in a car. (Tr. 184). She would visit her neighbors twice a month, but could no longer attend church because the lights, sounds, and people created too much stimulation that her doctor advised her to avoid. (Tr. 185). She did not have problems getting along with family, friends, neighbors, or others. (Tr. 186).

Plaintiff also filled out a Supplemental Function Questionnaire for pain. (Tr. 189). She stated that her pain began on January 19, 2012, when a woodpile fell on her head, and that ever since, her pain level varied from "moment to moment," but was constant. (Tr. 189). The pain was located across the entire top of her head, down into her forehead, and into the left side of her face and nose. (Tr. 189). To control the pain, she took Ibuprofen. (Tr. 190).

At her hearing on April 11, 2013, Plaintiff testified that she would get her

6

grandson up for school at 6:30 a.m., and would not do any household chores or yard work, which was done by her sons or grandsons. (Tr. 51, 55). She would shop for groceries once a month, and would have someone take her to do so. (Tr. 51). She needed to hold onto a shopping cart while shopping in order to prevent herself from falling. (Tr. 51). She did not have any hobbies, did not go on vacation, listened to but did not watch television, and did not read books due to her brain condition. (Tr. 51-52). The distance she could walk varied depending on how much she stumbled. (Tr. 52). Her ability to sit depended on her environment and whether or not lights were on or people were around, both of which made her dizzy and lightheaded. (Tr. 52). She elaborated that overhead lighting made her lightheadedness and dizziness "a lot worse," that it caused her to black out, and that she would have to lay down to counteract these symptoms after being in a room with this type of lighting. (Tr. 53-54). She also testified that she spent about six (6) to eight (8) hours a day lying down, but not in one (1) stretch. (Tr. 54). She had difficulty with short-term memory, impaired speech, and word recall problems as a result of her brain condition. (Tr. 56).

## MEDICAL RECORDS

On January 19, 2012, Plaintiff presented to the emergency room ("ER") at Muncy Valley Hospital after suffering a blow to her head when she slipped

pushing a wheelbarrow uphill, causing the wheelbarrow and the wood in it to flip onto her head and face. (Tr. 217). It was noted that she complained of a headaches, dizziness, and mild pain, but had no neck pain or loss of consciousness. (Tr. 217, 220). A physical exam revealed that Plaintiff had swelling and a superficial abrasion on her forehead, tenderness, swelling and ecchymosis localized to the ulnar aspect of her left hand, her speech, mood, and affect were normal, and she had no motor or sensory deficits. (Tr. 218, 220). Plaintiff underwent a CT scan, which was showed intracranial structures within normal limits, and an x-ray of her left hand, which showed no visible fracture. (Tr. 214-215). The clinical impression was that Plaintiff had sustained a blunt head injury, had a facial laceration and a left hand contusion, and was medically stable. (Tr. 218). At discharge, Plaintiff was listed as improved and stable, and was provided with written discharge instructions. (Tr. 221).

On February 3, 2012, Plaintiff presented to Ronald B. Mezick, PA-C ("PA Mezick"), who noted Plaintiff had a history of a concussion from the January 19, 2012 accident. She reported that she had been experiencing migraines after the trauma that started at her nose and went up over her scalp with severe facial pain on and off, intermittent confusion, random nausea of short duration, and a trigeminal pattern of superficial numbness. (Tr. 226). She was able to watch

television and work on the computer for about ten (10) minutes. (Tr. 226). Her physical exam revealed that she walked without a stagger, the left side of her face was still slightly swollen and tender with no redness, and her balance, grip, and strength were normal. (Tr. 226). Plaintiff was diagnosed with a concussion, and was scheduled for a follow-up in two (2) weeks. (Tr. 226).

On February 17, 2012, Plaintiff had a follow-up appointment with PA Mezick. (Tr. 228). Plaintiff reported that she had been experiencing short-term memory problems, mild dizziness, slight headaches and nausea, and lightheadedness. (Tr. 228). Her exam revealed that she was alert and oriented, had normal peripheral vision, had a normal balance text, and had no ataxia. (Tr. 228). She was scheduled for a follow-up in one (1) month. (Tr. 228).

On March 15, 2012, Plaintiff presented for a follow-up appointment with PA Mezick. (Tr. 230). Plaintiff stated that she felt as though someone put her head in a paint shaker, and that if she leaned over as far as "about a foot off the ground she passe[d] out." (Tr. 230). She was having some memory loss and was losing the ability to say words even when she knew what she wanted to say. (Tr. 230). Her nausea had resolved. (Tr. 230). Her physical exam showed no problems with balance, standing, walking, or touching her finger to her nose. (Tr. 230). She was instructed to limit work to a maximum of two (2) hours, and it was

9

recommended that she not drive. (Tr. 230).

On March 23, 2012, PA Mezick opined that Plaintiff was temporarily disabled for a period of twelve (12) months or more, from January 19, 2012 to January 20, 2013, due to concussion syndrome and vertigo. (Tr. 311).

On March 27, 2012, Plaintiff had an appointment with neurologist Kenny Alan Schwartz, M.D. (Tr. 245). She stated that since her accident on January 19, 2012, she had nausea, felt like she was going to black out when she leaned forward or to the side, could squat ok, felt like her head was in a paint shaker, was dizzy and lightheaded, had a decreased memory, forgot words, had issues with tasting food, felt better if she napped, and experienced swelling and numbness on the left side of her face with pain on the top of her head. (Tr. 245). Her medications list included Ibuprofen and Antivert for dizziness. (Tr. 245). Her physical exam revealed that she had redness to the left of her left eye, that her judgment and insight were normal, that she was alerted and oriented in four (4) spheres, that she had intact and equal facial sensation, and that she had normal motor strength, tone, and sensation. (Tr. 247). Dr. Schwartz diagnosed Plaintiff with post concussion syndrome with head pain, dizziness-syncope, and cognitive difficulty as a result of her injury on January 19, 2012. (Tr. 247). Dr. Schwartz prescribed Antivert for dizziness, and ordered Holter monitor and EEG testing.

10

(Tr. 247).

On March 30, 2012, Plaintiff had an appointment with PA Mezick. (Tr. 231). She was still have headaches and syncope daily, but had not started the Meclizine yet. (Tr. 231).

On April 9, 2012, Plaintiff underwent the EEG ordered by PA Mezick. (Tr. 289). The EEG interpretation stated that the EEG was within the wide range or normal limits for a patient of Plaintiff's age. Bitemporal rhythmic theta frequency slowing was seen during drowsiness and was most likely a normal variance. No definite epileptiform features were appreciated in the study, and no significant persistent asymmetries were noted. (Tr. 289).

On May 18, 2012, Jan Kapcala, D.O. filled out a Residual Functional Capacity Assessment form. (Tr. 70-71). Dr. Kapcala opined that Plaintiff could: (1) occasionally lift and/ or carry fifty (50) pounds; (2) frequently lift and/ or carry twenty-five (25) pounds; (3) walk, stand, and/ or sit for six (6) hours in an eight (8) hour workday; and (4) engage in unlimited pushing and pulling within the aforementioned lifting/ carrying weight limitations. (Tr. 70-71).

On June 7, 2012, Plaintiff had an appointment with PA Mezick. (Tr. 334). Plaintiff was stable, but continued to experience dizziness, lightheadedness, nausea, blurred vision, exacerbation of symptoms from lights, noise, sunshine,

11

crowds or outside stimulation, and had episodes of unsteadiness in the shower.
(Tr. 334). She also continued to experience swelling, redness, and pain where the
facial bones were injured, and her head still felt as if it was put into a paint shaker.
(Tr. 334). She continued to struggle with short term memory problems, forgot
words and how to say them, and got dizzy if she looked to the side or shook her
head. (Tr. 334). She was scheduled for a follow-up in three (3) months. (Tr.
334).

On September 18, 2012, Plaintiff had an appointment with PA Mezick. (Tr.
334). Plaintiff continued to feel the same since her last visit, and reported a new
onset of headaches that were different from her prior ones. (Tr. 335). Her
physical exam revealed that she experienced dizziness when turning left, right, and
backward. (Tr. 335). An MRI of the brain was ordered, and Plaintiff was
scheduled for a follow-up in three (3) months. (Tr. 335).

On September 20, 2012, Plaintiff had an MRI of her brain, which revealed
Plaintiff had: (1) an avidly enhancing smoothly marginate extra-axial mass
centered at the right cavernous sinus/ supraclinoid region with a broad dural tail
extending along the right tentorium compatible with an en plaque meningioma;
and (2) chronic left parietal lacunar infarct and chronic infarct in the left
cerebellum. (Tr. 327).

12

On October 12, 2012, Plaintiff had an appointment with Steven A. Toms, M.D. for a right cavernous sinus lesion. (Tr. 302). Plaintiff's physical exam was normal, but she was diagnosed with a benign neoplasm of cerebral meninges based on an interpretation of her brain MRI. (Tr. 305).

On November 1, 2012, Plaintiff had an appointment with PA Mezick. (Tr. 337). Plaintiff reported that her headaches started in her nose, and that ibuprofen no longer worked to control the pain. (Tr. 337). It was noted that Dr. Toms saw Plaintiff, and recommended that Plaintiff not have surgery at that time for her brain tumor because she had no deficits. (Tr. 337).

On December 17, 2012, Plaintiff had an appointment with PA Mezick for her ongoing post concussion problems. (Tr. 341). Her exam revealed that she was alert and oriented, but that she told the same story several times. (Tr. 341). Her strength and gait were normal, but the light in the exam room bothered her. (Tr. 341). Plaintiff was diagnosed with post concussion syndrome and common migraines. (Tr. 342). She was prescribed Amptriptyline and Sumatriptan Succinate tablets, and was scheduled for a follow-up in one (1) month. (Tr. 342).

On January 18, 2013, Plaintiff had a follow-up appointment with PA Mezick. (Tr. 344). Her symptoms remained the same, as did her medications, and she was scheduled for a follow-up in one (1) month. (Tr. 344).

13

On February 4, 2013, PA Mezick opined that Plaintiff was permanently disabled from January 19, 2012 forward due to post concussion syndrome. (Tr. 313).

On February 25, 2013, Plaintiff had an appointment with PA Mezick for a medicine check. (Tr. 346). Her post concussion syndrome was noted as being stable. (Tr. 346).

On February 26, 2013, Plaintiff had an appointment with Kristin Adams, M.D. (Tr. 315). Plaintiff was not accompanied by anyone to the appointment, and reported that she was experiencing post concussion syndrome after her January 19, 2012 accident. (Tr. 315). She stated that her headaches were occurring three (3) to four (4) times a week until she started Amptriptyline, which had relieved her symptoms. (Tr. 315). These migraines were located at the vertex and caused soreness in her left face and eye. (Tr. 315). Plaintiff elaborated that since her accident, she experienced multiple, chronic, constant symptoms with no improvement since the onset, including dizziness, lightheadedness, nausea, blurred vision, sensitivity to lights, noise, sunshine, people and outside stimulation, unsteadiness in the shower and when walking, an inability to look to the side or shake her head, a sore face, and vertigo episodes. (Tr. 315). Plaintiff's self-reported symptoms were that she was positive for sinusitis, vertigo, vision

14

changes, decreased appetite, decreased activity, fatigue, weight gain, nausea, appropriate interaction, dizziness, headache, lightheadedness, memory impairment, word finding difficulties, near syncope, vertigo, neck stiffness, and environmental allergies. (Tr. 317). Her physical exam revealed normal vision, reflexes, and sensation, intact coordination, balance, and gait, normal language, insight, judgment, attention span, and concentration, and an elevated mood. (Tr. 319). Dr. Adams noted a "disconnect between the patient's description of the severity of her cognitive and neurological deficits and her affect." (Tr. 319). Dr. Adams diagnosed Plaintiff with post-traumatic headaches and a meningioma, and referred Plaintiff to neurologist Dr. Landis for further neurocognitive testing. (Tr. 320).

On March 29, 2013, PA Mezick opined that Plaintiff was unable to work, and that Plaintiff: (1) could not lift more than ten (10) pounds; (2) could not stand/ walk for more than one (1) hour or sit for more than four (4) to six (6) hours; (3) could not drive for more than one (1) hour; (4) should avoid bending, climbing, twisting, stooping, and kneeling; (5) would require unscheduled breaks during an eight (8) hour work day; and (6) would require more than two (2) days per month in absences from work. (Tr. 324).

On May 20, 2013, Plaintiff underwent an MRI of her brain. (Tr. 365). The

15

MRI Impression stated that Plaintiff had a dural based lesion of the right

cavernous sinus consistent with her known meningioma, a slightly narrowed

carotid artery, and asymmetric enhancement surrounding his Meckel's cave with

enhancement at the level of the foramen ovale. (Tr. 366). The report stated that

"meningioma invasion cannot be entirely excluded. If there is clinical concern for

skullbase involvement, contrast enhanced CT examination may be of benefit for

further evaluation." (Tr. 366).

On the sixth, sixteenth, seventeenth, and thirty-first of May, 2013, Richard

Landis, Ph.D. Of Susquehanna Health Medical Group conducted a

Neuropsychological Assessment of Plaintiff. (Tr. 353-359). Dr. Landis'

Psychodiagnostic Impression of Plaintiff included the following: (1) an Axis I

Symptom Disorder involving a mild to moderate perceptual-cognitive disorder,

primarily involving visual-motor skills, balance, and the higher verbal-intellectual

and language-related processes; (2) an Axis II diagnosis of Developmental/

Personality disorder, including compulsive personality traits; (3) an Axis III

diagnosis of Physical Symptoms/ Disorders, including probable

neuropsychological deficits, perhaps involving functions of both cerebral

hemispheres to some extent, perhaps secondary to an interaction of a growing

right hemisphere meningioma and left hemisphere infarcts and/ or contusions, and

a right cavernous sinus meningioma; (4) an Axis IV diagnosis of Severe

Psychosocial Stressors, including those associated with parenting a grandson,

financial stressors, stressors stemming from the loss of neuropsychological

functions; and (5) an Axis V diagnosis of Adaptive Functioning that was fair to

good.  (Tr. 358-359).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether

a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.
34475 (July 2, 1996).  A regular and continuing basis contemplates full-time
employment and is defined as eight hours a day, five days per week or other
similar schedule.  The residual functional capacity assessment must include a
discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;
Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that
which an individual is still able to do despite the limitations caused by his or her
impairment(s).").

"At step five, the burden of proof shifts to the Social Security
Administration to show that the claimant is capable of performing other jobs
existing in significant numbers in the national economy, considering the
claimant's age, education, work experience, and residual functional capacity. "
Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.
2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status
requirements of the Social Security Act through the date last insured of December
31, 2015.  (Tr. 17).  At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful work activity from his alleged onset date of January 19, 2012.

(Tr. 17).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "post-concussion syndrome, post-traumatic syndrome, and obesity (20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. 18).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 18-19).

At step four, the ALJ determined that Plaintiff had the RFC to perform sedentary work with limitations.  (Tr. 15).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

> finds that [Plaintiff] has the [RFC] to perform medium work as
> defined in 20 CFR 404.1567(c) and 416.967(C) except that the
> claimant: could occasionally balance, stoop, crouch, crawl,
> kneel, and climb, but never on ladders, ropes, or scaffolds;
> must avoid concentrated exposure to extreme temperatures,
> humidity, vibrations, excessive noise, and hazards such as
> moving machinery and unprotected heights; could do simple,
> routine tasks, but no complex tasks; could complete work in a
> low stress environment defined as one with only occasional
> decision-making and as one with only occasional changes in
> the work setting.

(Tr. 19).

At step five of the sequential evaluation process, the ALJ determined that,

given Plaintiff's RFC, she was able to perform past relevant work as a cashier.

(Tr. 24).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between January 19, 2012, the alleged onset

date, and the date of the ALJ's decision.  (Tr. 24).

## **DISCUSSION**

On appeal, Plaintiff asserts the following arguments: (1) there was a lack of

evidence to support the ALJ's rejection of the opinions of Plaintiff's treating

medical providers; (2) there is a lack of substantial evidence to support the ALJ's

finding that Plaintiff lacks credibility; and (3) there is new and material evidence

that was not unavailable at the time of the hearing.  (Doc. 8, pp. 7-13).  Defendant

disputes these contentions.  (Doc. 9, pp. 12-25).

1.   <u>**Medical Opinion Evidence**</u>

Plaintiff argues that the ALJ erred in giving no weight to PA Mezick's opinion and little weight to Dr. Wetzel's opinion because they were consistent with and supported by the record and Plaintiff's impairments.  (Doc. 8, pp. 7-9).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits.  <u>See</u>, <u>e.g.</u>, <u>Morales v. Apfel</u>, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time."  <u>Morales</u>, 225 F.3d at 317; <u>Plummer</u>, 186 F.3d at 429; <u>see also</u> 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  <u>Morales</u>, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each

24

opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review."  In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Additionally, the Third Circuit has repeatedly held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence

and not due to his or her own credibility judgments, speculation or lay opinion."

Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal citations

omitted); See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("An ALJ is

not free to set his own expertise against that of a physician who presents

competent evidence" by independently "reviewing and interpreting" the medical

evidence.).

Regarding the relevant medical opinion evidence, the ALJ gave great

weight to several opinions. He gave great weight to the opinion of Dr. Kahler, the

physician who examined Plaintiff the day the wheelbarrow accident occurred and

opined that Plaintiff was to miss one (1) day of work. (Tr. 22). Great weight was

also given to the opinion rendered by Dr. Kapcala in the state agency physical

assessment. (Tr. 23). Dr. Kapcala opined that Plaintiff could lift and carry fifty

(50) pounds occasionally and twenty-five (25) pounds frequently, and could walk,

stand, or sit for up to six (6) hours in an eight (8) hour workday. (Tr. 23). The

ALJ placed great weight on this opinion because it was "consistent with the

totality of the evidence of record as a whole." (Tr. 23).

The ALJ gave little weight to the opinion of Dr. Wetzel rendered on March

15, 2012, in which it was opined that Plaintiff was limited to two (2) hours of

work per day because it was not "specific as to the durataional requirement of this

limitation," this opinion was rendered two weeks after the original injury thus not supporting the "open-ended direction limiting [Plaintiff] to only 2 hours of work per day, indefinitely," and Plaintiff's objective exam findings were essentially benign. (Tr. 22-23).

The ALJ also gave little weight to PA Mezick's opinion that Plaintiff was disabled until January 26, 2013 and to PA Mezick's Physical Capacity Evaluation performed on March 14, 2013 because they were "not supported by objective medical testing and examination and [was] contrary to [Plaintiff's] longitudinal clinical treatment history" and because Plaintiff's objective exam findings were essentially benign. (Tr. 22-23). Furthermore, the ALJ explained that PA Mezick is not an acceptable medical source from whom the existence of a medically determinable impairment may be established according to 20 C.F.R. § 416.913(a). (Tr. 22).

Upon review of the entire record and the ALJ's RFC determination, it is determined that the ALJ improperly afforded great weight to the opinion of state agency physician Dr. Kapcala in reaching the RFC determination because the state agency examination record indicates that the whole medical record was not available for review. (Tr. 70-71). While the medical records up to the date Dr. Kapcala rendered her opinion on May 18, 2012 were included, what was not

reviewed and therefore excluded from Dr. Kapcala's review were the medical records from the exams that took place after Dr. Kapcala rendered this opinion. As discussed, in order for the ALJ to properly give any weight to a medical opinion, the entire medical record must have been available for and reviewed by the non-examining, non-treating physician. See Sassone, 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of the entire record). However, in the case at hand, the entire medical record was not available to the non-examining, non-treating physician (Dr. Kapcala) whose opinion was afforded great weight by the ALJ.

Therefore, because the opinion of the state agency physician was not well-supported by the entire record as it did not include a review of the entire record, including many visits and exams that occurred after the opinion was issued on May 18, 2012, substantial evidence does not support the RFC determination. As such, remand on this basis is necessary, and this Court declines to address Plaintiff's remaining assertions.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner for further proceedings.

A separate Order will be issued.

**Date**: January 11, 2016

/s/ William J. Nealon
**United States District Judge**

29